Barkley B. Smith, ISBN 9193
Barkley Smith Law, PLLC
206 W. Jefferson St.
Boise, ID 83702
P: 208-481-4812
Email: barkley@barkleysmithlaw.com

Attorney for Plaintiff,

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ABBY WILKINSON,<br><br>                    Plaintiff,<br>v.<br><br>EQUIFAX INFORMATION SERVICES,<br>LLC., EXPERIAN INFORMATION<br>SOLUTIONS INC., TRANS UNION LLC.,<br>NATIONAL CREDIT SYSTEM, INC.,<br><br>                    Defendant. | Case No.: 4:23-cv-527<br><br>**COMPLAINT**<br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Abby Wilkinson ("Plaintiff" or "Ms. Wilkinson"), by and through the undersigned counsel,

brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax");

Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union")

(collectively, the "Credit Bureau Defendants"); and National Credit Systems, Inc. ("NCS"); (all

defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      Unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable

procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

8. *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not

prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that Plaintiff owed a debt for a collection account during one or more months in the past two years.

12.     Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     Plaintiff also brings a claim against Defendant NCS for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs

and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

15.     Abby Wilkinson ("Plaintiff" or "Ms. Wilkinson") is a natural person residing in St. Pocatello, Idaho, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.     Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309 and can be served at their registered agent address at Corporation Service Company at 2 Sun Court, Suite 400 Peachtree Corners, GA 30092, and is authorized to do business in the State of Idaho, including within this District.

17.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, CA 92626, and is authorized to do business in the State of Idaho, including within this District.

19.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

20.     Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a

limited liability company with a principal place of business located at 555 West Adams Street, Chicago, IL 60661. Trans Union can be served at its registered agent, Illinois Corporation Service Company, located at 801 Adlai Stevenson Dr., Springfield, IL 62703, and is authorized to do business in the State of Idaho, including within this District.

21.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.    Defendant National Credit Systems Inc. ("NCS") is a national bank with its headquarters in Georgia. NCS's principal address is 1775 The Exchange SE Suite 300, Atlanta GA 30339, and they can be served at CT Corporation Systems, 1555 W Shoreline Dr Ste 100 Boise, ID 83702 and is authorized to do business in the State of Idaho, including within this District.

23.    NCS is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

26.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

27.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

28.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  See 15 U.S.C. § 1681(b).

29.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

30.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## Factual Background

31.     The United States Congress has found that the banking system is dependent upon

fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

32.    32.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

33.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

34.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

35.    The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)    Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)    Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)    Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities,

such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

36.     The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

37.     The majority of institutions that offer financial services (*e.g.*, banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

38.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

39.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

40.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

41.     The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

42.     The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

43.     DTI compares the total amount a consumer owes to the total amount a consumer

earns.

44.    The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

45.    The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

46.    The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

47.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

48.    Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

49.    The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**Plaintiff Enters into a Joint Lease Agreement at Latitude 2976 Apartments**

50.    Sometime in 2021, Plaintiff and her partner jointly entered an apartment lease contract (the "lease agreement") for an apartment unit at Latitude 2976 Apartments (the

"apartment"), which is owned and managed by non-party Lurin Real Estate Holdings XXI, LLC ("Lurin"). Per the lease agreement, the initial term began on July 2, 2021, and ended on July 1, 2022.

51.     From July 2, 2021, through July 1, 2022 (when Plaintiff's lease ended), Plaintiff and her partner never missed their monthly rental payment.

52.     Due to personal issues, on April 15, 2022, Plaintiff moved out of the apartment. Plaintiff's partner remained in the apartment and continued to make the monthly rental payments through the lease term. After this date, Plaintiff did not return to nor reside at the apartment complex.

53.     In a letter dated April 26, 2022, Plaintiff provided a written notice to Lurin that she would not be renewing her lease at the end of the lease term. Plaintiff sent this letter via U.S. Postal Service Certified Mail with a postmarked date of April 29, 2022. The letter was delivered on May 3, 2022.

54.     Sometime around May 18, 2022, after the initial lease term had expired, a representative of the apartment complex contacted Plaintiff to ask whether Plaintiff would sign to renew or extend the lease agreement. Plaintiff did not sign any agreement to renew or extend the lease agreement.

55.     Sometime in September 2022, Plaintiff's, now former, partner sent a picture of an eviction summons and informed Plaintiff that she needed to appear for an eviction proceeding entered against Plaintiff.

56.     Thereafter, Plaintiff made several attempts to contact the apartment complex and Lurin to no avail. Despite Plaintiff's efforts to resolve the matter directly, Plaintiff did not receive any information from the apartment complex nor Lurin.

//

**Plaintiff Submits Direct Disputes to Defendant NCS from March through May 2023**

57.    Sometime in February 2023, Plaintiff received a notice from Defendant National Credit Systems, Inc. ("NCS") for the collection of a debt originally owed to Latitude Twenty Nine Seventy Six Apts / 101 in the amount of $7,540.81.

58.    Upon review of the ledger included within the February 2023 letter, Plaintiff saw that most of the charges were made from July 15, 2022, through November 27, 202, **after** Plaintiff's initial July 1, 2022 lease term had already ended.

59.    Plaintiff was undoubtedly confused and concerned because she had moved out of the apartment back in April 2022, provided written notice to the apartment complex of Plaintiff's intent not to renew her lease agreement, and did not sign any agreements to extend or renew Plaintiff's lease.

60.    In a letter dated March 6, 2023, Plaintiff sent a letter via U.S. Postal Service certified mail to Defendant NCS to dispute this alleged debt owed. Plaintiff also provided a copy of the April 26, 2022, written notice that Plaintiff sent to the apartment complex.

61.    In Defendant NCS's response letter to Plaintiff, dated March 23, 2023, NCS claimed that it did not have enough information, and asserting that Plaintiff did owe the alleged debt.

62.    Plaintiff sent another letter dated March 31, 2023, via U.S. Postal Service certified mail, disputing that Plaintiff owed the debt for charges made after July 1, 2022.

63.    Plaintiff sent a third letter dated April 21, 2023, to Defendant, again disputing the alleged debt owed.

64.    In a letter dated May 9, 2023, Defendant NCS responded to Plaintiff's letter and

included documents indicating that the charges were made within a lease term ending on **January 19, 2023**.

65.      Despite Plaintiff's efforts to resolve the alleged debt owed directly with Defendant NCS, Defendant NCS continued to erroneously assert that Plaintiff owed the full amount of the debt owed.

### Credit Bureau Defendants Report that Plaintiff Owes a Collection Account

66.      Despite Plaintiff's multiple efforts to dispute the debt directly with Defendant NCS, in July 2023, Plaintiff reviewed her consumer reports and discovered that all of the Credit Bureau Defendants were reporting that Plaintiff was responsible for a collection account in the amount of $7,540 owed to Defendant NCS. Plaintiff was devastated, she took her credit health seriously and was concerned about any negative impact to her credit score and creditworthiness.

67.      Plaintiff reviewed the pertinent details within each of Plaintiff's reports and learned that the balance owed to Defendant NCS was for a Joint Account for approximately $7,540 and opened on February 22, 2023.

68.      Upon information and belief, Defendant NCS reported to the Credit Bureau Defendants that Plaintiff jointly owed $7,540.

69.      The Credit Bureau Defendants reported to Plaintiff's credit file and reports that Plaintiff jointly owed approximately $7,540 to Defendant NCS.

70.      Plaintiff was confused and distressed by this information. Plaintiff had moved out of the apartment back in April 2022, provided written notice to the apartment complex of Plaintiff's intent not to renew her lease agreement, and did not sign any agreements to extend or renew Plaintiff's lease.

### Plaintiff's First Dispute to the Credit Bureau Defendants
### Regarding the Inaccurate Credit Reporting

71.     Sometime in July 2023, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the collection account for approximately $7,540 with each of the Credit Bureau Defendants.

72.     Plaintiff explained that the joint account for the approximately $7,540 in relation to the collection account with Defendant NCS was inaccurate.

73.     Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

74.     Upon information and belief, Equifax sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's July 2023 dispute to Equifax.

75.     On August 6, 2023, Defendant Equifax issued dispute results to Plaintiff. Within this letter, Defendant Equifax indicated that it would not delete the collection account.

76.     Further, the disputed information would not be corrected, modified, or deleted because Equifax had verified that the disputed information was accurate.

77.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

78.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's July 2023 dispute.

79.     Thereafter, Defendant Equifax failed to correct or delete the collection account appearing in Plaintiff's credit file.

80.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered July 2023, or any reinvestigation whatsoever, to determine whether the disputed

information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

81.     Upon information and belief, Experian sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's July 2023 dispute to Experian.

82.     On August 7, 2023, Defendant Experian issued dispute results to Plaintiff. Within this letter, Defendant Experian indicated that it would not delete the collection account.

83.     Further, the disputed information would not be corrected, modified, or deleted because Experian had verified that the disputed information was accurate.

84.     Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

85.     Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's July 2023 dispute.

86.     Thereafter, Defendant Experian failed to correct or delete the collection account appearing in Plaintiff's credit file.

87.     Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered July 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

88.     Upon information and belief, Trans Union sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's July 2023 dispute to Trans Union.

89.     On August 12, 2023, Defendant Trans Union issued dispute results to Plaintiff.

Within this letter, Defendant Trans Union indicated that it would not delete the collection account.

90.    Further, the disputed information would not be corrected, modified, or deleted because Trans Union had verified that the disputed information was accurate.

91.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

92.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's July 2023dispute.

93.    Thereafter, Defendant Trans Union failed to correct or delete the collection account appearing in Plaintiff's credit file.

94.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered July 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

95.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

96.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

97.    That lexicon or unique language is commonly referred to in the credit reporting

industry as "Metro 2 Format" or "Metro 2."

98.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

99.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

100.     Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

101.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

102.     These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

103.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

104.     The data furnishers, like Defendant NCS, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

105.     Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account

entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant NCS's Unreasonable Dispute Reinvestigation**

106.    Upon information and belief, in or about July 2023, Defendant NCS received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

107.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered in or about July 2023.

108.    Upon information and belief, Defendant NCS verified the disputed information as accurate to Defendant Equifax in or about July 2023.

109.    Upon information and belief, in or about July 2023, Defendant NCS received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

110.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Experian regarding Plaintiff's dispute tendered in or about July 2023.

111.    Upon information and belief, in or about July 2023, Defendant NCS verified the disputed information as accurate to Defendant Experian.

112.    Upon information and belief, in or about July 2023, Defendant NCS received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

113.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered in or about

July 2023.

114.    Upon information and belief, in or about July 2023, Defendant NCS verified the disputed information as accurate to Defendant Trans Union.

115.    Defendant NCS violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff's Second Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

116.    As of August 2023, Defendant Equifax was reporting that Plaintiff owed $7,540 to Defendant NCS for a collection account associated with Plaintiff's former apartment complex for charges made after Plaintiff's initial lease term had already ended.

117.    As of August 2023, Defendant Experian was reporting that Plaintiff owed $7,540 to Defendant NCS for a collection account associated with Plaintiff's former apartment complex for charges made after Plaintiff's initial lease term had already ended..

118.    As of July 25, 2023, Defendant Trans Union was reporting that Plaintiff owed $7,540 to Defendant NCS for a collection account associated with Plaintiff's former apartment complex for charges made after Plaintiff's initial lease term had already ended.

119.    Plaintiff was frustrated at the continued inaccurate reporting.  Plaintiff was damaged and harmed by the Defendants' reckless and negligent conduct and sham "investigations."

120.    In August 2023, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the collection account associated with Defendant NCS with each of the Credit Bureau Defendants.

121.    Plaintiff sent a dispute letter dated August 15, 2023, via U.S. Postal Service certified mail, to each of the Credit Bureau Defendants.

122.    Plaintiff explained that the joint account for the approximately $7,540 in relation to the collection account with Defendant NCS was inaccurate.

123.    Further, in support of Plaintiff's dispute and to establish that the Credit Bureau Defendant's reporting was inaccurate, Plaintiff enclosed the April 26, 2022 notice of intent Plaintiff sent to the Lurin, the certified mail receipt for that notice, the apartment lease contract, and her government-issued identification.

124.    Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

### Defendant Equifax's Unreasonable Reinvestigation

125.    Defendant Equifax received Plaintiff's August 15, 2023, dispute and request that Equifax delete the collection account from Plaintiff's credit file on August 21, 2023.

126.    Upon information and belief, Defendant Equifax sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's August 15, 2023, dispute to Defendant Equifax.

127.    On September 15, 2023, Defendant Equifax issued dispute results to Plaintiff. Within this letter, Defendant Equifax indicated that it would not delete the collection account. Further, the disputed information would not be corrected, modified, or deleted because Equifax had verified that the disputed information was accurate. Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

128.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's August 15, 2023dispute.

129.    Thereafter, Defendant Equifax failed to correct or delete the collection account appearing in Plaintiff's credit file. .

130.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered August 15, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Reinvestigation**

131.    Defendant Experian received Plaintiff's August 15, 2023, dispute and request that Experian delete the collection account from Plaintiff's credit file on August 21, 2023.

132.    Upon information and belief, Defendant Experian sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's August 15, 2023, dispute to Defendant Experian.

133.    Despite Plaintiff providing personal identifying information and a copy of her government-issued identification, on August 23, 2023, Defendant Experian issued a letter to Plaintiff stating that it would not take any action in regard to Plaintiff's August 15, 2023 dispute.

134.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

135.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's August 15, 2023 dispute.

136.    Thereafter, Defendant Experian failed to correct or delete the collection account appearing in Plaintiff's credit file.

137.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered August 15, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

<b>Defendant Trans Union's Unreasonable Reinvestigation</b>

138.    Defendant Trans Union received Plaintiff's August 15, 2023, dispute and request that Trans Union delete the collection account from Plaintiff's credit file on August 21, 2023.

139.    Upon information and belief, Defendant Trans Union sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's August 15, 2023 dispute to Defendant Trans Union.

140.    On September 19, 2023, Defendant Trans Union issued dispute results to Plaintiff. Within this letter, Defendant Trans Union indicated that it would not delete the collection account.

141.    Further, the disputed information would not be corrected, modified, or deleted because Equifax had verified that the disputed information was accurate.

142.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

143.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's August 15, 2023, dispute.

144.    Thereafter, Defendant Trans Union failed to correct or delete the collection account appearing in Plaintiff's credit file.

145.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered August 15, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in

violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant NCS's Unreasonable Dispute Reinvestigation**

146.    Upon information and belief, in or about August or September 2023, Defendant NCS received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

147.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered in or about August 15, 2023.

148.    Upon information and belief, in or about August or September 2023, Defendant NCS verified the disputed information as accurate to Defendant Equifax.

149.    Upon information and belief, in or about August or September 2023, Defendant NCS received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

150.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Experian regarding Plaintiff's dispute tendered in or about August 15,2023.

151.    Upon information and belief, in or about August or September 2023, Defendant NCS verified the disputed information as accurate to Defendant Experian.

152.    Upon information and belief, in or about August or September2023, Defendant NCS received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

153.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered in or about

August 15,2023.

154.    Upon information and belief, in or about August or September2023, Defendant NCS verified the disputed information as accurate to Defendant Trans Union.

155.    Defendant NCS violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff's Third Dispute to the Credit Bureau Defendant Experian Regarding the Inaccurate Credit Reporting**

156.    As of August 23, 2023, Defendant Experian was reporting that Plaintiff owed $5,740 to Defendant NCS.for a collection account associated with Plaintiff's former apartment complex for charges made after Plaintiff's initial lease term had already ended.

157.    Plaintiff was frustrated at the continued inaccurate reporting.  Plaintiff was damaged and harmed by Defendant Experian's reckless and negligent conduct and sham "investigation."

158.    On or about September 5, 2023, extremely shocked, surprised, and embarrassed at the Defendant Experian's inaccurate reporting, Plaintiff disputed the collection account with Defendant Experian.

159.    Plaintiff explained that the joint account for the approximately $7,540 in relation to the collection account with Defendant NCS was inaccurate.

160.    Further, in support of Plaintiff's dispute and to establish that Defendant Experian's reporting was inaccurate, Plaintiff enclosed the April 26, 2022 notice of intent Plaintiff sent to the Lurin, the certified mail receipt for that notice, the apartment lease contract, and her government-issued identification.

161.    Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and to send her a corrected copy of her credit report.

**Defendant Experian's Unreasonable Reinvestigation**

162.    Defendant Experian received Plaintiff's September 5, 2023, dispute and request that Equifax delete the collection account from Plaintiff's credit file on September 5, 2023.

163.    Plaintiff did not receive a response from Defendant Experian following the receipt of Plaintiff's September 5, 2023 dispute.

164.    Upon information and belief, Defendant Experian sent Defendant NCS an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 5, 2023 dispute to Defendant Experian.

165.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

166.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's September 5, 2023 dispute.

167.    Thereafter, Defendant Experian failed to correct or delete the collection account appearing in Plaintiff's credit file.

168.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's September 5, 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant NCS's Unreasonable Dispute Reinvestigation**

169.    Upon information and belief, in or about September  2023, Defendant NCS received Defendant Experian's ACDV and failed to conduct a reasonable investigation with

respect to the information disputed by Plaintiff.

170.    Upon information and belief, Defendant NCS failed to review all relevant information provided by Defendant Experian regarding Plaintiff's September 5, 2023 dispute.

171.    Upon information and belief, in or about September 2023, Defendant NCS verified the disputed information as accurate to Defendant Experian.

172.    Defendant NCS violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

173.    As of October 5, 2023, Defendant Experian reported that Plaintiff owed $5,740 to Defendant NCS for a collection account associated with Plaintiff's former apartment complex for charges made after Plaintiff's initial lease term had already ended.

174.    Plaintiff reasonably believes that Defendant NCS continued to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff owed $5,740 toDefendant NCS beginning in February 2023..

175.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff was owed $5,740 to Defendant NCS beginning in February 2023..

176.    As a result of the inaccurate credit reporting, the Defendants made it practically impossible for Plaintiff to continue to obtain credit.

**Plaintiff's Loan Application is Denied in September 2023**

177.    On September 19, 2023, Plaintiff submitted a personal loan application to non-party Idaho Central Credit Union ("Idaho Central").

178.    Idaho Central denied Plaintiff's application on September 19, 2023.

179.    Within the adverse action notice dated September 19, 2023, Idaho Central cited that Plaintiff's denial was a result of information obtained by Defendant Experian.

**Plaintiff's Credit Applications are Denied in September 2023**

180.    In or around October 2023, Plaintiff submitted a credit application to non-party Wells Fargo Bank, N.A. ("Wells Fargo").

181.    Wells Fargo denied Plaintiff's application for credit. Within the adverse action notice dated October 1, 2023, Wells Fargo cited that Plaintiff's denial was a result of information obtained by Defendant Equifax.

182.    In or around October 2023, Plaintiff submitted a credit application to non-party Capital One N.A. ("Capital One").

183.    Capital One denied Plaintiff's application for credit. Within the adverse action notice dated October 24, 2023, Capital One cited that Plaintiff's denial was a result of information obtained by the Credit Bureau Defendants and non-party LexisNexis Risk Solutions, Inc.

184.    Barclays denied Plaintiff's application for credit.  With the adverse action notice dated November 4, 2023, Barclays cited that the denial was the result of information provided by Defendant Trans Union.

185.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

186.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

187.    As a standard practice, the Credit Bureau Defendants do not conduct independent

investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

188.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

189.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

190.    Plaintiff re-alleges and incorporates by reference the allegations set forth in

preceding paragraphs as if fully stated herein.

191.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

192.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

193.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

194.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

195.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

196.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

197.    As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing

and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

198.    Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

199.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

200.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

201.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information, "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id.*

202.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

203.    On at least two occasion during the past year, Plaintiff disputed the inaccurate

information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, the collection account for approximately $7,540 in relation to the alleged debt owed to Defendant NCS.

204.    In response to Plaintiff's disputes, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

205.    In response to Plaintiff's disputes, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

206.    In response to Plaintiff's disputes, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

207.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

208.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to

correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

209.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

210.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(Only Claim for Relief Against Defendant NCS)**

211.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

212.    Defendant NCS furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

213.    Defendant NCS violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's disputes, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian,

and Trans Union.

214.    As a result of Defendant NCS's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

215.    Defendant NCS's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant NCS was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

216.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant NCS in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.      Determining that Defendants negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 21st day of November 2023.

By: */s/ Barkley Smith*
Barkley B. Smith
Attorney for Plaintiff